**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CAROLYN THOMAS o/b/o | § | |
| C.T., a minor, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-07-2043 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

<u>**MEMORANDUM AND RECOMMENDATION ON
MOTIONS FOR SUMMARY JUDGMENT**</u>

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial

management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B).  (Docket Entry #3).  Pending before the

court are cross-motions for summary judgment which were filed by Carolyn Thomas ("Plaintiff,"

"Thomas") and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as

Commissioner of the Social Security Administration ("SSA").  (Plaintiff's Motion for Summary

Judgment ["Plaintiff's Motion"], Docket Entry #19; Defendant's Motion for Summary Judgment

["Defendant's Motion"], Docket Entry #13).  Each party has also filed a response to the competing

motions.  (Defendant's Response to Plaintiff's Motion for Summary Judgment ["Defendant's

Response"], Docket Entry #20, Plaintiff's Response to Defendant's Memorandum in Support of

Cross Motion for Summary Judgment Filed March 17, 2008 ["Plaintiff's Response"], Docket Entry

#21).  After considering the pleadings, the evidence submitted, and the applicable law, it is

**RECOMMENDED** that Plaintiff's motion be **GRANTED**, and that Defendant's motion be

**DENIED**.

**Background**

On September 29, 2003, Carolyn Thomas ("Thomas"), mother of C.T., filed an application for Supplemental Security Income under Title XVI of the Social Security Act ("the Act") on her son's behalf. (Transcript ["Tr."] at 22, 104–06). Thomas claimed that C.T. had been disabled since August 1, 2003, due to ADHD[1] and asthma.[2] (Tr. at 104–06). The SSA denied Thomas's application on November 17, 2003, finding that C.T. is not disabled under the Act. (Tr. at 93). On December 1, 2003, Thomas petitioned for a reconsideration of that decision. (Tr. at 89). The SSA then had her case independently reviewed, but again denied C.T. benefits, on February 2, 2004. (Tr. at 85).

On March, 22, 2004, Thomas requested a hearing before an administrative law judge ("ALJ"). (Tr. at 84). That hearing, before ALJ William B. Howard, took place on October 4, 2005. (Tr. at 341). Thomas appeared and testified at the hearing, and was accompanied by her attorney, Donald Dewberry. (*Id.*). The ALJ also heard testimony from C.T., but no medical expert testified. (Tr. at 344–46).

Following the hearing, the ALJ engaged in the following three-step, sequential analysis to determine: (1) whether the child is engaged in substantial gainful activity; (2) if not, whether the child had a medically "severe" impairment or combination of impairments; and (3) if so, whether the child's impairment or combination of impairments meets, medically equals, or functionally

---

[1] "ADHD," or "Attention Deficit Hyperactivity Disorder," is "a childhood mental disorder with onset before 7 years of age and involving impaired or diminished attention, impulsivity, and hyperactivity." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 147 (5th ed. 1998).

[2] "Asthma" is "a respiratory disorder characterized by recurring episodes of paroxysmal dyspnea, wheezing on expiration/inspiration caused by constriction of the bronchi, coughing, and viscous mucoid bronchial secretions. The episodes may be precipitated by inhalation of allergens or pollutants, infection, cold air, vigorous exercise, or emotional stress." *Id.* at 137.

equals the severity of an SSA Listing.  *See* 20 C.F.R. § 416.924(b)–(d).  At the third step of the analysis, the Commissioner evaluates the child's functioning in the following six domains:  (1) "acquiring and using information"; (2) "attending and completing tasks"; (3) "interacting and relating with others"; (4) "moving about and manipulating objects"; (5) "caring for [one]self"; and (6) "health and physical well-being."  *See* 20 C.F.R. § 416.926a(b)(1).  A child functionally equals the "listed-level severity" of an SSA Listing if his impairment results in "marked" limitations in two domains or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(d).  A "marked" limitation is one that is "more than moderate, but less than extreme."  20 C.F.R. § 416.926a(e)(2)(i).  A marked limitation is present if the alleged impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities.  (*Id.*).  A child is said to have an "extreme" limitation if his impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  In determining whether a child-claimant has a marked or extreme limitation, the Commissioner must review all of the evidence of record and "compare [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments."  20 C.F.R. § 416.926a(f)(1); *see also* 20 C.F.R. § 416.926a(b).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that, although C.T. was not engaged in substantial gainful activity and his ADHD and Tourette's syndrome were considered "severe" impairments, they did not meet or medically equal the severity of any impairment listed in the regulations.  (Tr. at 23).  The ALJ found that C.T. had less than marked limitations in attending to and completing tasks, interacting with and relating to others, caring for himself, and in his health and physical well-being.  (Tr. at 28).  The ALJ also

3

determined that C.T. had no limitations in acquiring and using information and in moving about and manipulating objects.  (*Id.*).  He concluded, ultimately, that C.T. "not been under a disability at any time through the date of this decision."  (*Id.*).

On November 2, 2005, Thomas requested an Appeals Council review of the ALJ's decision. (Tr. at 17).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances are present:  "(1) there is apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 & 416.1470.  On August 24, 2006, the Appeals Council denied Thomas's request, finding that no applicable reason for review existed.  (Tr. at 5).  With that ruling, the ALJ's findings became final, and, on June 20, 2007, Thomas filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Plaintiff's Original Complaint, Docket Entry #1).  Having considered the pleadings, the evidence submitted, and the applicable law, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **GRANTED**, and that Defendant's cross-motion be **DENIED**.

**Standard of Review**

Federal courts review the Commissioner's decision to deny disability benefits only to ascertain whether it is supported by substantial evidence and whether the proper legal standards were applied.  *See Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.* (citing *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995)). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a

conclusion.  It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  In making this determination, the court must weigh the following four factors:  the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; subjective evidence of pain and disability; and the claimant's age and education.  *See Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

**Discussion**

In her motion, Thomas claims that C.T. became disabled on August 1, 2003, due to ADHD, Tourette's syndrome,[3] and asthma.  (Plaintiff's Motion at 3, 17).  She asks the court to reverse the Commissioner's decision to deny C.T. disability benefits, and to render a judgment in her favor, for a number of reasons.  (*Id.* at 4).  First, Thomas claims that the ALJ failed to properly evaluate the credibility of her testimony.  (*Id.* at 6).  She also contends that the ALJ erred, at step three of his analysis, because he did not find that C.T. had at least a marked limitation in the following domains: attending to and completing tasks; interacting with and relating to others; caring for himself; and

---

[3] "Gilles de la Tourette's syndrome," commonly referred to as "Tourette's syndrome," is "an abnormal condition characterized be facial grimaces, tics, and involuntary arm and shoulder movements.  In adolescence the condition worsens; the patient may grunt, snort, and shout involuntarily . . . .  In adulthood the condition usually lessens and tends to wax and wane."  MOSBY'S at 690.

health and physical well-being.  (*Id.* at 11–17).  In particular, Thomas complains that the ALJ made

no findings whatsoever on C.T.'s asthma.  (*Id.* at 17–18).  Defendant insists, however, that the ALJ

properly considered all of the evidence, and followed the applicable law, in determining that C.T.

is not disabled.  (Defendant's Response at 1, 4).

### Medical Facts, Opinions, and Diagnoses

The earliest available evidence shows that, on October 29, 1999, Thomas took C.T. to the

emergency room at Spring Branch Medical Center because he was "pulling [his] left ear."  (Tr. at

265).  The attending physician noted that, during his examination, C.T. was "smil[ing]," "active,"

"playful," and "attentive."  (Tr. at 267).  A chest x-ray from this visit revealed a "consolidation in

the right lung base without definite obscuration of the right heart border," which is "consistent with

a pneumonia in the right lower lobe."  (Tr. at 268).

On November 11, 1999, C.T. visited the pediatric asthma clinic at Memorial Hermann

Hospital of Houston.  (Tr. at 291).  C.T.'s attending physician, Robert Yetman, M.D. ("Dr.

Yetman"), noted that the child and his mother were "living at a treatment center at which there are

multiple people who smoke."  (*Id.*).  An x-ray of C.T.'s chest showed "hyperinflation with generous

perihilar lung markings."  (*Id.*).  Dr. Yetmen's physical examination revealed a "comfortable

respiratory rate, no retractions, good air entry, no crackles, [and] no wheezes."  (Tr. at 292).  Dr.

Yetman's impression was that C.T. had "[r]eactive airway disease exacerbation . . . [s]tatus post

pneumonia [and a h]istory of chronic otitis media."[4]  (*Id.*).  Dr. Yetman prescribed Flovent[5] and

directed C.T. to "continue albuterol[6] nebulizers . . . ."  (*Id.*).

---

[4] "Otitis media" is the "inflammation of the middle ear."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1372 (31st ed. 2007).

[5] "Flovent" is "the trademark for preparations of fluticasone propionate."  *Id.* at 727.  "Fluticasone propionate" is "a synthetic corticosteroid used . . . by inhalation in maintenance and treatment of asthma."  *Id.* at 730.

[6] "Albuterol" is "a ß-adrenergic agonist . . . administered by inhalation as a bronchodilator for the treatment and prophylaxis of bronchospasm associated with bronchitis, pulmonary emphysema, or other chronic obstructive airway disease, the treatment of asthma-associated bronchospasm, and the prophylaxis of exercise-induced bronchospasm."

On November 13, 1999, C.T. was admitted to Texas Children's Hospital "with a presumptive diagnosis of pneumonia." (Tr. at 299).  Michael S. Kessler, M.D. ("Dr. Kessler"), C.T.'s attending physician, reported that he "[l]ives in [a] rehab shelter" with "positive smokers." (Tr. at 300–01). An x-ray of C.T.'s chest showed a "rounded opacity . . . within the right upper lobe area." (Tr. at 316).  C.T. was "discharged home" on November 16, 1999, with a diagnosis of "[r]ight upper lobe pneumonia, iron deficiency anemia."   (Tr. at 301).   Upon discharge, Dr. Kessler prescribed cefuroxime[7] and iron. (*Id.*).

The next available evidence shows that, on March 30, 2000, C.T. went to Memorial Hermann Hospital for continued testing and treatment for his "recurrent pneumonia." (Tr. 289).  An upper gastrointestinal examination revealed the following: "clear lungs with a normal heart size";"[r]adiopaque densities in the left hilar region"; "[d]ysfunction of the pharyngeal[8] phase of swallowing . . . with deep laryngeal[9] penetration with some clearing"; "[a]bnormal tertiary contractions . . . consistent with esophageal dysmotility"; and "[a] normal duodenum[10] and ligament of Treitz." (*Id.*).  A subsequent gastrointestinal examination, administered on June 8, 2000, showed an "improvement in the laryngeal dysfunction with honey consistency." (Tr. at 288).  Although "a decrease in the laryngeal penetrations [was] witnessed[, ]they were still present." (*Id.*).

On November 15, 2000, C.T. returned to Memorial Hermann for "[t]onsillectomy and adenoidectomy" surgery. (Tr. at 286).  His attending physician, Kevin Pereira, M.D., commented that C.T. "would benefit from [the surgery] to treat his upper airway resistance syndrome." (*Id.*).

---

DORLAND'S at 46.

[7] "Cefuroxime" is "a semisynthetic, broad-spectrum, ß-lactimase-resistant, second-generation cephalosporin effective against a wide range of gram-positive and gram-negative bacteria. *Id.* at 317.

[8] "Pharyngeal" pertains to the "pharynx," which is commonly referred to as the "throat." *See id.* at 1446–47.

[9] "Laryngeal" pertains to the "larynx," which is "the upper part of the windpipe." *See id.* at 1020–21.

[10] "Duodenum" is "the first or proximal portion of the small intestine . . . extending from the pylorus to the jejunum . . . ." *Id.* at 580.

7

On March 24, 2001, an x-ray of C.T.'s chest showed that his "lung fields [were] clear," that his "heart and mediastinal structures [were] normal," and that his "ribs and bony thorax [were] intact." (Tr. at 283).

On September 20, 2002, Thomas brought C.T. to the Ambulatory Pediatric Service, complaining that his "day-care [was] always calling regarding [C.T.'s] behavior." (Tr. at 188). His attending physician observed that, during the physical examination, "C.T. was running around [the] room, unable to be still even thru [sic] exam – pulling things off [the] wall, out of pockets, moving off table." (Tr. at 189). The physician noted that C.T. had a "history of asthma [that was] well controlled." (*Id.*). C.T. was directed to "continue Serevent,[11] Flovent, [and] albuterol," and he was referred for "behavior modification." (*Id.*).

On February 20, 2003, C.T. returned to the Ambulatory Pediatric Service for a check up. (Tr. at 186). Thomas complained that C.T. "won't listen" and that he "plays with matches" and "leaves home alone." (*Id.*). She requested a psychiatric consultation. (*Id.*). C.T.'s treating physician, Scott Wenderfer, M.D. ("Dr. Wenderfer"), stated that C.T. had "behavior problems," "an asthma-like illness," "in utero cocaine exposure," and a history of "recurrent otitis media [after a] tonsillectomy and adenoidectomy." (Tr. at 187). Dr. Wenderfer referred C.T. to "pediatric psychiatry" and "instructed [Thomas] on discipline." (*Id.*).

On March 13, 2003, Thomas brought C.T. to the Ambulatory Pediatric Service to follow up on an "[e]ar infection." (Tr. at 184). There, Dr. Wenderfer reported that C.T. had "no asthma attacks but snores loud at night." (*Id.*). He also noted that C.T. was "still acting up and not behaving" and that there was "minimal disciplining by [Thomas]." (*Id.*). During the physical

---

[11] "Serevent" is "the trademark for a preparation of salmeterol xinafoate." *Id.* at 1722. "Salmeterol xinafoate" is "a ß-adrenergic agonist . . . administered by inhalation as a bronchodilator for the treatment and prophylaxis of bronchospasm associated with asthma, bronchitis, pulmonary emphysema, or other chronic obstructive airway disease . . . ." DORLAND'S at 1689.

8

examination, Dr. Wenderfer observed that C.T. was "not staying in [his] seat [and was] grabbing medical instruments." (*Id.*).

On July 25, 2003, Thomas returned with C.T. to the Ambulatory Pediatric Service with complaints of "cough[,] congestion[, and] wheezing." (Tr. at 182). The attending physician observed that C.T. was "very hyperactive with behavioral problems [and had] been referred to [pediatric psychiatry] previously, but mom lost information." (*Id.*). During the visit, the physician reported that C.T. was "[p]layful" and exhibited "no shortness of breath [or] wheezing." C.T.'s prescriptions for Flovent, Albuterol, and Serevent were renewed. (Tr. at 183).

The earliest medical record of C.T.'s treatment at the Primary Medicine Center of Houston is a "progress and communication" note, dated August 24, 2003. (Tr. at 249). Thomas brought C.T. to the Center complaining of his "uncontrollable behavior[, low] concentration[, low] attention span[, and high] hyperactivity." (*Id.*). On this visit, Wafaa Farag, M.D. ("Dr. Farag") reported that, according to Thomas, C.T. was "bed wetting," but "slep[t] ok" and that his "appetite [was] ok." (*Id.*). At that visit, Thomas claimed that C.T. "fights physically, destroys toys[, and] slams doors." (*Id.*). Dr. Farag diagnosed C.T. with "ADHD" and prescribed "Adderall XR 10 mg."[12] (*Id.*).

On September 11, 2003, C.T. visited the Ambulatory Pediatric Service for a follow up regarding his "asthma." (Tr. at 180). Dr. Wenderfer reported that C.T. had "[s]tarted on Adderall," but showed "[n]o improvement in symptoms on 10mg Adderall XR." He also noted that C.T. had "moderate persistent asthma – controlled on meds." (Tr. at 181).

On September 19, 2003, C.T. returned to the Primary Medicine Center "for a medicine check [on his] [A]dderall XR 10mg." (Tr. at 331). The consultant's name appears to be "Dr. Louis, Ph.D., LPC." ("Dr. Louis"). In her notes from that visit, Dr. Louis stated that C.T.'s "medications work

---

[12] "Adderall" is the "trademark for a combination preparation of amphetamine and dextroamphetamine, used in the treatment of attention-deficit/hyperactivity disorder." DORLAND'S at 27.

well during the day - [a]t school," but C.T. remained "somewhat hyperactive in [the] afternoon." (*Id.*).  She reported that, in "one incident," C.T. was "aggressive with [a] teacher" by "kicking her." (*Id.*).  Dr. Louis also noted that C.T. was "no[t] bedwetting" and was "sleeping okay," but had a "[d]ecreased appetite." (*Id.*).  Dr. Farag, upon review of Dr. Louis's assessment, found that C.T. should "continue medicines." (*Id.*).

On October 13, 2003, Thomas took C.T. to the Ambulatory Pediatric Service, because she was "concerned about [a reduction in C.T.'s] eating." (Tr. at 178).  There, the attending physician reported that C.T. has "normal activity and behavior during [the] day," but he is "hyperactive" in the evening.  (*Id.*).  The doctor "advised supervision at school with meals," and gave C.T. a "nutrition referral." (*Id.*).

On November 12, 2003, C.T. visited Primary Medicine Center for a "medicine refill [of] Adderall 10mg." (Tr. at 330).  Thomas reported that C.T. was "still hyperactive" and "talked too much," but "no fighting now." (*Id.*).  Thomas also told Dr. Louis that C.T. had "muddle insomnia ([d]reaming about deceased grandmother)," and that he "ha[d] started bedwetting again." (*Id.*).  After reviewing Dr. Louis's notes, Dr. Farag increased the dosage of C.T.'s prescription for "Adderall to 15mg." (*Id.*).

On November 14, 2003, Ben White, M.D. ("Dr. White") completed an "initial" disability evaluation for the SSA regarding C.T.'s ADHD and asthma.  (Tr. at 196–97).  Dr. White concluded that C.T.'s "[i]mpairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the [Act's] listings." (Tr. at 196).  Unfortunately, it is apparent that several pages of this evaluation are missing from the record.  (*See id.*).

On January 7, 2004, C.T. visited Primary Medicine Center for a refill of "Adderall 15mg." (Tr. at 329).  Thomas complained that C.T. had been "hitting himself in the face," that he had "walk[ed] on the roof," and that he still had a "short attention span." (*Id.*).  At the time of the visit,

C.T. had been "off medication for two weeks." (*Id.*).  Dr. Louis stated that, "on medication [C.T.]

has [d]ecreased hyperactivity," but "[s]ix hours after medication [, he] excessive[ly] talk[s]." (*Id.*).

Dr. Farag "continued [C.T.'s] medication." (*Id.*).

On January 21, 2004, Dr. Farag completed a "Mental Status Examination Report" on C.T.

(Tr. at 202–03).  In her report, she stated that C.T. has "normal" "mood and affect" and that he had

"good" "[g]eneral appearance, grooming, [and] motor behavior." (*Id.*).  Dr. Farag reported that she

did not have enough information to determine whether C.T. had problems with "memory,"

"[a]ttention and concentration," or "[i]nsight and judgment." (*Id.*).  She diagnosed C.T. with

"ADHD" and stated that his "prognosis" was "good with treatment." (Tr. at 204).

On January 29 and January 30, 2004, Patricia Nicol, M.D. ("Dr. Nicol") and Jim Onx, Ph.D.

("Dr. Onx") completed a "reconsideration" disability evaluation for the SSA. (Tr. at 198–99).  They

reviewed C.T.'s impairments of ADHD and asthma. (*Id.*).  The doctors concluded that C.T.'s

"[i]mpairment or combination of impairments is severe, but does not meet, medically equal, or

functionally equal a listing." (Tr. at 200).  They found, in particular, that C.T. had a "less than

marked" limitation in the domain of acquiring and using information, based upon one of the "pre-K

school" reports. (Tr. at 200).  The doctors determined that C.T. had a "marked" limitation in the

domain of attending and completing tasks, because a "[t]eacher report" indicated that C.T. "can

function 'OK' on medication," but the "[t]eacher notes 'poor' [for his ability to] complete[] tasks

on time, [and] 'poor' [for his ability to] follow[] oral [instructions]." (Tr. at 200).  They stated that

C.T. had a "less than marked" limitation in the domain of interacting with and relating to with

others. (Tr. at 200).  The doctors found that the allegations of C.T.'s behavioral "limitations are not

credible," and noted that his "treating doctor for ADHD states [that his] prognosis is good."  The

doctors also mentioned that C.T.'s asthma was "stable" with no "hospitalization or emergency room

visits for asthma." (Tr. at 201).

On February 4, 2004, C.T. and Thomas visited Dr. Farag at the Primary Medicine Center. (Tr. at 329).  Thomas told Dr. Farag that she was "concerned about [C.T.] not wanting to go out." (*Id.*).  Dr. Farag reported that C.T. was "doing well on med[ication]" and that his weight was "stable." (*Id.*).  Dr. Farag continued C.T. on "Adderall XR 15mg." (*Id.*).  During C.T.'s next visit, on March 26, 2004,  Thomas told Dr. Farag that C.T. was "still hyperactive after school." (Tr. at 328).  Dr. Farag then prescribed Remeron.[13]  (*Id.*).

On April 16, 2004, an ambulance brought C.T. to the emergency room at Memorial Hermann Hospital, because he had a "cough, [a] cold for four days, fever [and] chest pain." (Tr. at 215–16). In his chart, the "[t]riage RN" recorded that C.T. was "anxious" and had a temperature of "102 degrees." (Tr. at 216).  An x-ray of C.T.'s chest revealed "[a]telectasis in the lingula of the left upper lobe" and "over-inflated lungs consistent with a history of asthma." (Tr. at 227).  C.T.'s attending physician, James McCarthy, M.D. ("Dr. McCarthy"), diagnosed C.T. with "[p]neumonia." (Tr. at 221).  Dr. McCarthy prescribed Augmentin[14] and discharged C.T. in "[s]table" condition. (Tr. at 221).  C.T.'s primary care physician, Dr. Yetman, ordered a follow-up x-ray of C.T.'s chest. (Tr. at 213).  That x-ray, taken on May 4, 2004, was a "[n]ormal chest radiograph with interval resolution of the previously seen opacity involving the lingula." (*Id.*).

On May 4, 2004, during another visit to Primary Medicine Center, Dr. Farag reported that C.T. was "doing well" on his medications and she refilled his prescription for Remeron. (Tr. at 328).

During C.T.'s next visit, on June 23, 2004, Dr. Farag commented that he had "been doing well" and

---

[13] "Remeron" is the "trademark for a preparation of mirtazapine." DORLAND'S at 1646. "Mirtazapine" is an "antidepressant compound unrelated to any of the classes of antidepressants; administered orally." *Id.* at 1186.

[14] "Augmentin" is the "trademark for combination preparations of amoxicillin and clavulanate potassium." DORLAND'S at 181. "Amoxicillin" is "a semisynthetic derivative of ampicillin effective against a broad spectrum of gram-positive and gram-negative bacteria . . . ." *Id.* at 66.  "Clavulanate potassium" is "a ß-lactamase inhibitor used in combination with penicillins in treating infections caused by ß-lactamase-producing organisms." *Id.* at 376.

had "no sleep [or] appetite problems." (Tr. at 327.)  She continued C.T.'s prescriptions for Adderall XR and Remeron.  (*Id.*).

On September 15, 2004, C.T. and his father visited Dr. Farag.  (Tr. at 327).  According to Dr. Farag, C.T. was "doing well," but was "restless because of no medication." (*Id.*).  Dr. Farag "restarted" C.T. on "Adderall XR 15mg" and "Remeron [] 15mg."  (*Id.*).  When C.T. and his father returned to Dr. Farag on October 20, 2004, his "father reported that medication [was] not working" and that C.T. was "blinking a lot."  (Tr. at 327).  Dr. Farag "stop[ped] Adderall" and prescribed "Methylin 15mg."[15] (*Id.*).

On October 28, 2004, C.T. was seen by Sergio Facchini, M.D. ("Dr. Facchini"), on a referral from Dr. Farag, "for a second opinion from a neurologist."  (Tr. at 296).  Dr. Facchini noted that C.T. "has been on Adderall 15 mg . . . for the past two years."  (*Id.*).  He recorded Thomas's concern that "the medicine does not seem to be working anymore" and that "[C.T.] is on the go, is inattentive and hyperactive, tends to be destructive" and "gets in fights."  (*Id.*).  Dr. Facchini reported "episode[s] of "eye blinking, mak[ing] sounds from his throat, and at times has some facial twitching."  (*Id.*).  His final impression was that C.T. had "[a]ttention deficit hyperactivity disorder with mild Tourette's syndrome."  (Tr. at 297).  He recommended that C.T. "continue taking ADHD medication, either Adderall or the new medicine that the child psychiatrist will be prescribing." (*Id.*).  Dr. Facchini "reassured [Thomas] about [C.T.'s ]Tourette's and the mild nature of the illness and "informed [her] of the likelihood of an exacerbation of the motor and visual tics[16] because of

---

[15] "Methylin" is the "trademark for preparations of methylphenidate hydrochloride.  DORLAND'S at 1171. "Methylphenidate hydrochloride" is a "central stimulant used in the treatment of attention-deficit/hyperactivity disorder, narcolepsy, and certain forms of depression associated with medical conditions which would preclude treatment with conventional antidepressants; administered orally." *Id.*

[16] A "tic" is "an involuntary, compulsive, rapid, repetitive, stereotyped movement or vocalization, experienced as irresistible although it can be suppressed for some length of time; occurrence is exacerbated by stress and diminished during sleep or engrossing activities. Tics may be either psychogenic or neurogenic in origin and are subclassified as either simple, such as eye blinking, shoulder shrugging, coughing, grunting, snorting, or barking, or complex, such as facial gestures, grooming motions, coprolalia, echolalia, or echokinesis."  *Id.* at 1953.

13

the ADHD medicine." (*Id.*).

On January 26, 2005, Thomas and C.T. met with Dr. Farag. (Tr. at 325). Thomas informed Dr. Farag that C.T.'s father was "going nuts" trying to give him medication. (*Id.*). Dr. Farag continued C.T.'s prescriptions for Methylin and Remeron. (*Id.*). During a visit on February 24, 2005, Dr. Farag "advised [Thomas] to give C.T. a "lower dose during the weekend," and continued the Methylin and Remeron prescriptions. (Tr. at 325). When C.T. and Thomas returned to Dr. Farag on March 1, 2005, Thomas "reported that [C.T. had] been having both motor, vocal, chronic tics for 3 years." (Tr. at 324). During that visit, Dr. Farag observed that C.T. was "sniffling" and "bit[ing] [his] nails." (*Id.*). In response to C.T.'s father's report "that [C.T.] is still hyperactive on Methylin 10mg," Dr. Farag increased the dosage of his prescription to 15mg. (*Id.*). She also prescribed Risperdal[17] "for tics." (*Id.*).

On March 1, 2005, Dr. Farag completed a "Mental Residual Functional Capacity Questionnaire" regarding C.T. (Tr. at 244). In it, she conducted a "DSM-IV Multiaxial Evaluation." (*Id.*). For "Axis I," Dr. Farag concluded that C.T. suffered from "ADHD combined [with] Tourette's chronic motor tics." (*Id.*). In "Axis II," she wrote "R10 MR." (*Id.*). For "Axis III," Dr. Farag noted C.T.'s "asthma." (*Id.*).[18] Finally, for Axis V: Current GAF," she assessed a Global Assessment of Functioning ("GAF") of "50."[19] (*Id.*). Dr. Farag stated that C.T.'s "prescribed medications" were Methylin and Risperdal, and listed the following "side effects" of those medications: dizziness, drowsiness, fatigue, and stomach upset. (*Id.*). She reported that C.T.

---

[17] "Risperdal" is the "trademark for preparations of risperidone." DORLAND'S at 1674. "Risperidone" is a "benzisoxazole derivative used as an antipsychotic agent, administered orally." *Id.*

[18] She did not list anything for "Axis IV." (*See* Tr. at 244).

[19] The GAF scale is used to rate "overall psychological functioning on a scale of 0-100," with 100 representing "superior functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994). A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

"is very hyperactive without meds," but had a "favorable response" to "Methylin 15mg." (*Id.*). Dr. Farag noted that C.T. "may" "have a low IQ or reduced intellectual functioning." (Tr. at 244–47). She concluded that C.T.'s "impairment lasted or can be expected to last at least twelve months," and that C.T.'s "impairments [are] reasonably consistent with symptoms and functional limitations described in [the] evaluation." (Tr. at 248).

On March 24, 2005, C.T. and his father visited Dr. Farag. (Tr. at 323). C.T.'s "father reported [a] decrease in nail biting [and] no sniffing" and that "[C.T.] took meds once per day during spring break." (*Id.*). Dr. Farag continued C.T.'s prescription for 15mg of Methylin and Risperdal. (*Id.*). C.T. and his parents visited Dr. Farag again on April 20, 2005, because C.T. was "still hyperactive." (Tr. at 322). Dr. Farag observed that C.T. was "very hyperactive during the interview." (*Id.*). It appears that she then prescribed Ritalin LA.[20] (*Id.*). During a visit on April 25, 2005, C.T.'s parents "reported that [C.T. was] having tics." (Tr. at 322). C.T.'s "father gave him Methylin" and had "not started [giving C.T. the] Ritalin." (*Id.*). Dr. Farag observed that C.T. was "very hyperactive in the office." (*Id.*). She increased C.T.'s Risperdal prescription and continued his prescription for Ritalin LA. (*Id.*). C.T. and his mother returned to Dr. Farag on May 4, 2005. (Tr. at 321). Dr. Farag reported that C.T. was "doing better [and was] less hyperactive," but that she observed a "motor tic." (*Id.*). There was no change in C.T.'s medication. (*Id.*). During a visit on June 1, 2005, Dr. Farag stated that C.T. was "doing better but still somewhat hyperactive [with a] few tics." (Tr. at 321). During a subsequent visit on July 28, 2005, Dr. Farag noted that C.T. had "been out of meds for one month," and that he was "very hyperactive [with] facial tics (grimaces)." (Tr. at 320). C.T. "reported seeing dust when he takes [the] medicines." (*Id.*). Dr. Farag changed

---

[20] "Ritalin" is the "trademark for preparations of methylphenidate hydrochloride." DORLAND'S at 1674. "Methylphenidate hydrochloride" is a "central stimulant used in the treatment of attention-deficit/hyperactivity disorder, narcolepsy, and certain forms of depression associated with medical conditions which would preclude treatment with conventional antidepressants; administered orally." *Id.* at 1171.

C.T.'s medication from Ritalin LA to "Focalin XR 20mg,"[21] and she continued his prescriptions for

Risperdal and Remeron.  (*Id.*).

### School Records

On October 20, 2003, Tonia Butler ("Ms. Butler"), the assistant principal at Clemente

Martinez Elementary School, created a "School Activity Report" for C.T.  (Tr. at 128).  In her

report, Ms. Butler stated that "before being placed on the medication, [C.T.] was disruptive,

displayed violence [sic] toward other students, and was unable to follow basic school rules."  (*Id.*).

However, Ms. Butler also commented that C.T. "behaves like a normal 4 year old when he is on his

prescribed medications" and has "[n]o physical or psychological limitations . . . ."  (Tr. at 128–29).

Ms. Butler then assessed C.T.'s behavior in several categories. (Tr. at 129).  She reported that C.T.

had an "above average" ability to do the following: comprehend classroom discussion; remember

information just heard; express himself adequately when called upon; adapt to new situations

without getting upset; initiate activities independently; retain instruction from week to week; and

complete tasks on time.  (Tr. at 129).  She found that C.T. had an "average" ability to follow oral

instructions, to respond appropriately to praise and correction, and to make and keep friends.  (*Id.*).

One month later, on November 11, 2003, C.T.'s pre-kindergarten teacher, Loan Monroig

("Ms. Monroig"), completed a "Prekindergarten Report Card."  (Tr. at 173).  According to her

report,  C.T. was "developing" his abilities to do the following: listen actively and respond "using

action" and to "use new vocabulary." (*Id.*).  Ms. Monroig found that C.T. "consistently" "[s]hares,

works, and cooperates with others" and "expresses thoughts, feelings, and ideas."  (*Id.*).  She also

commented that C.T. "is a very good helper and worker," but "needs to work on his listening skills."

---

[21] "Focalin" is the "trademark for preparations of dexmethylphenidate hydrochloride."  *Id.* at 731. "Dexmethylphenidate hydrocloride" is a "central nervous system stimulant thought to block reuptake of norepinephrine and dopamine in to the presynaptic neuron, increasing their release into the extraneuronal space; used in the treatment of attention-deficit/hyperactivity disorder, administered orally."  *Id.* at 511.

(*Id.*).

On January 23, 2004, Ms. Monroig evaluated C.T. in a "School Activity Report." (Tr. at 132). She determined that C.T. had a "poor" ability to follow oral instructions; organize and accomplish tasks; and complete tasks on time. (Tr. at 133). She rated as "below average" C.T.'s ability to do the following: remember information just heard, adapt to new situations without getting upset, initiate activities independently, respond appropriately to praise and correction, and retain instruction from week to week. (Tr. at 133). Ms. Monroig remarked that, without medication, C.T. "talks back," "doesn't follow any of the school rules," and "doesn't get any work done." (Tr. at 133). She also noted, however, that C.T. "can function O.K. with medications." (Tr. at 132).

From August 30, 2004 to May 6, 2005, C.T.'s kindergarten teacher, Lakitha Johnson ("Ms. Johnson"), recorded C.T.'s behavior in weekly conduct reports. (Tr. at 153–58). Only some of those reports are included in the record. During the week of August 30, 2004, C.T.'s behavior was said to be "O.K." every day except Thursday, when he "was out of seat[] without permission" and "under [the] table." (Tr. at 156). For the week beginning January 31, 2005, Ms. Johnson stated that C.T.'s behavior for that week "could have been better." (*See* Tr. at 156–57). C.T.'s behavior during the week of February 25, 2005, was "O.K." until Friday, when C.T. was "flipping around" and "out of his seat constantly." (Tr. at 155). Ms. Johnson reported that, during the week of April 25, 2005, C.T.'s behavior was satisfactory, except on Wednesday, when he was "yelling and talking." (Tr. at 154). In the final record, dated May 2–6, 2005, Ms. Johnson noted that C.T. had been "very disruptive" and "talk[ed] too much" on Tuesday of that week. (Tr. at 153).

In an undated report, Ms. Johnson summarized her observations of C.T.'s behavior from January 2005 to April 2005. (Tr. at 151). She stated that C.T. "(for the most part) is a well-behaved child. . . [but h]e does have his days where I have to CONSTANTLY correct his behavior." (*Id.*). She explained that C.T. is a "normal little boy who misbehaves SOMETIMES," but "[w]hen [she]

reprimand[s] him for his misbehavior he corrects it IMMEDIATELY!" (*Id.*). She also mentioned that, although he is not a difficult kid to teach,"[h]e is VERY hyperactive, but most kids are at this age." (*Id.*).

On September 17, 2004, Ms. Johnson created a "Kindergarten Progress Report" for C.T. (Tr. at 168). In it, she reported that C.T. "[n]eeds [r]einforcing" in his ability to do the following: recall important information, listen attentively for a variety of purposes, sequence events correctly, count to 100, identify and extend patterns; and write within a defined space. (*Id.*). She stated that he satisfactorily follows oral directions, contributes to group activities, works and plays well alone and with others, follows school and classroom rules,  and shares classroom materials.  (*Id.*). Ms. Johnson remarked that C.T. displayed an "[e]xceptional" ability to "recite[] the alphabet" and to "complete[] tasks on time." (*Id.*). In closing, she stated that C.T. is a "[g]ood kid!" and requested that Thomas "[k]eep working with him on listening more and less talking."  (*Id.*).

On November 30, 2004, Ms. Johnson completed another "Kindergarten Progress Report." (Tr. at 169). In this report, she stated that C.T. satisfactorily "uses time and materials effectively"; "works and plays well alone and with others"; "follows school and classroom rules"; "expresses feelings in acceptable ways"; "shares classroom materials"; and "works carefully and neatly." (*Id.*). In a "Report to Parents," Ms. Johnson evaluated C.T.'s performance in kindergarten for the 2004-2005 school year. (Tr. at 166–67). She rated C.T.'s abilities as "satisfactory" or better in all categories. (*Id.*). She commented that C.T. is a "smart student" that needs to "keep working on talking less." (Tr. at 167).

On June 17, 2005, C.T.'s summer school teacher, Tiffanie Cole ("Ms. Cole"), prepared an "Interim Report to Parents." (Tr. at 176). In the report, she stated that "[C.T.] is such a kind student [that] stays on task and completes his assignments." (*Id.*). She mentioned that C.T. "needs to work on . . . listening, following directions and taking turns to talk." (*Id.*). In a "Summer School

18

Cumulative Learning Profile," dated June 27, 2005, Ms. Cole reported that "[C.T.'s] behavior fluctuates not because of his temperament but due to his ability to follow directions on that particular day." (Tr. at 175).  She stated that "[C.T.'s] participates orally and on every written language arts assignment [and] pay[s] attention to detail." (*Id.*).  Ms. Cole also mentioned that C.T. "demonstrates independent reading skills." (*Id.*).

### *Educational Background and Present Age*

C.T. was born on October 16, 1998.  (Tr. at 104).  He was seven years old and in the first grade at the time of the administrative hearing.  (Tr. at 22, 334).

### *Subjective Complaints*

In her application for benefits on behalf of C.T., Thomas claimed that he was "disabled" because he suffered from "ADHD and asthma." (Tr. at 108).  She explained that, as a result of these conditions,  C.T. "is very disruptive in class," he "does not follow orders," and "[h]is behavior is very bad." (Tr. at 109).  In her request for reconsideration, Thomas claimed that C.T.'s condition had worsened because, although "Dr. Farag upgraded [his] med[ication]s," he still exhibited "out of control behaviors." (Tr. at 114).  She also claimed that C.T. "use[d] profanity, [fought] back . . . and [tore] up stuff." (*Id.*).

In support of her claim, Thomas submitted letters written by several of her neighbors and friends. (Tr. at 147–150).  In one such letter, Dannie Green claimed that she "ha[s] been babysitting [C.T.] and [has] known [him] about seven years[, and she] know[s] that [C.T.] is a problem child [and is] a disturb[ed] little child [who] can't be still." (Tr. at 149).  C.T.'s neighbor, Donald Mayes, wrote that C.T. "gives [Thomas] a[n] extra hard time [and] she's always calling him over and over all threw [sic] the day [and] she punish[es] him [but] it does not work or help." (Tr. at 148).  Crezetta White stated that C.T. is "on medication but it don't [sic] seem like it because she constantly have [sic] to run behind him and tell him the same thing over and over again." (Tr. at 147).

During the hearing, the ALJ elicited testimony from both C.T. and his mother.  (Tr. at 342).

C.T. testified that he likes school and  "learn[ing] Spanish."  (Tr. at 344).  He also testified that he

likes to "[p]lay outside" with his "best friend" and "play baseball" at the park.  (Tr. at 345).

Before the ALJ, Thomas testified that C.T.'s alleged disability first manifested behavioral

problems at the age of two.  (Tr. at 353).  She claimed that, in response to her attempts to discipline

him, C.T. "would be defiant [and] would not listen to anything" she said.  (*Id.*).  Even after she "put

him in time-out or . . . spank[ed] him[, h]e would still not listen."  (*Id.*).  Thomas testified that she

sought medical advice about C.T.'s "behavior" after school administrators informed her that they

"believ[ed] it's something more [than just bad behavior] and he need[ed] to be evaluated."  (*Id.*).

She stated that the school told her "they would not tolerate [C.T.'s] behavior" and would not allow

C.T. to continue going to school there" unless he got "some medical help."  (Tr. at 354).  Thomas

complied with the school's request, and brought C.T. to see Dr. Farag,[22] "a psychiatrist."  (*Id.*).

According to Thomas, Dr. Farag initially prescribed "Adderall" for C.T.  (Tr. at 355).  However,

because C.T. "would still act out," Dr. Farag "increased the dosage . . . from 10[milligrams] to 15

[milligrams, t]hen she went to 20[milligrams, but C.T.] would still act out."  (*Id.*).  Later, she said,

"Dr. Farag put him on another prescription [for] Methylin [a]nd Risperdal."  (Tr. at 355–56).

Thomas also testified about several incidents in which she claims that C.T. exhibited

aggressive behavior.  She testified that C.T. "got angry at a little boy[,] so he picked up a broken

glass off the ground and he throwed [sic] it and he cut [the boy] in the head."  (Tr. at 357).  She

stated that C.T. had once attempted to fight a neighbor "with a knife" because "he had got mad" at

the neighbor.  (Tr. at 358).  She also testified that, after she had sent C.T. "to his room as a

punishment," on one occasion, he "kicked his [window] screen out and got on the roof because he

didn't want to stay in his room."  (Tr. at 359).  On another occasion, C.T. "bit[] a kid" during a fight.

---

[22] Throughout the hearing, Dr. Farag was incorrectly referred to as "Dr. Faray."

(Tr. at 360).  She testified that C.T. acted aggressively toward her as well.  She claimed that C.T. "cuss[ed] [her] out" and "raise[d] his hand up at [her]."  (Tr. at 362).  She said that, in response to her attempts to "spank him" with "a belt," C.T. would "raise [another] belt up at her" and had even "hit[] [her] with a belt."  (Tr. at 362).

Thomas testified that C.T. cannot sleep through the night and that he "wets the bed."  (Tr. at 362).  She claimed that C.T. is "getting worse," and that the "medication pretty much is not helping" him.  (Tr. at 364–65).  She testified that "sometimes the medication work[s]," but she "don't [sic] really care for him to be on the medications."  (Tr. at 368).  Thomas told the ALJ that she "take[s] him off medication on the weekends" even though C.T.'s doctor "told [her] to keep him . . . on it at a[ll] times."  (Tr. at 368–69).  She claimed that "a lot of time[s]" she "can't get [C.T.] to take medication . . . [because] [h]e's rebellious."  (Tr. at 369).  Thomas also mentioned, however, that C.T. would take the medication, "no question asked," if his father was present.  (*Id.*).

Thomas testified that, although C.T. does not "play [sports] on a team," he sometimes plays basketball "in the front yard with the other little boys around the apartment complex." (Tr. at 371). She also mentioned that C.T. plays basketball with his father, but she has not "seen him play baseball."  (*Id.*).

### The ALJ's Decision

Following the hearing, the ALJ made written findings on the evidence.  (Tr. at 22–28).  From his review of the record, the ALJ found that C.T. has never engaged in any substantial gainful activity.  (Tr. at 23).  He also determined that C.T. suffered from ADHD and Tourette's syndrome, and he found that these conditions were "severe."  (Tr. at 23).  However, the ALJ found that neither of C.T.'s impairments, alone or in combination, met the criteria of any impairment "listed in 20 CFR 404 Subpart P, Appendix 1."  (*Id.*).  In making that determination, the ALJ considered C.T.'s limitations in the required six domains and determined each of them to be less than "marked."  (Tr. at 27).  The ALJ concluded that, because C.T. suffered no marked limitation in any of the required

21

domains, he was not disabled within the meaning of the Act. (Tr. at 27). With that conclusion, he denied Thomas's application for disability benefits on behalf of C.T. (*Id.*). That denial prompted Thomas's request for judicial review.

Before this court, Thomas claims that the ALJ failed to properly evaluate the credibility of her testimony. (Plaintiff's Motion at 6–7). She also argues that the ALJ "erred in his assessment of the limitations resulting from [C.T.'s] impairments." (*Id.* at 4). In particular, she challenges the ALJ's failure to find "marked" limitations in the following domains: attending and completing tasks; interacting and relating with others; caring for oneself; and health and physical well-being. (*Id.* at 11–17). Plaintiff argues that the evidence supports a finding of at least a marked limitation in each of these domains. (*Id.*).

It is well settled that judicial review of the ALJ's decision is limited to a determination of whether the decision is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id.* A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

*Credibility Assessment of Plaintiff's Testimony*

Thomas alleges, first, that the ALJ failed to properly assess her credibility. (Plaintiff's Motion at 6–7). She claims that "the ALJ's credibility finding consists of the following statement: 'The testimony of the claimant's mother is not fully credible to the extent alleged as explained in the body of this decision.'" (*Id.* at 7). In response, the Commissioner argues that the ALJ "made affirmative findings regarding her testimony based on the entire record." (Defendant's Motion at 1). Defendant argues further that the ALJ "determined that, based on the objective evidence,

Plaintiff's statements regarding the alleged severity of C.T.'s impairments were not entirely credible and gave Plaintiff's subjective complaints no precedence over conflicting medical and school evidence." (*Id.* at 2).

In determining whether a claimant is disabled, the ALJ must consider all of a claimant's symptoms, and the "extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929. If a child claimant is unable to "adequately describe" his symptoms, the ALJ will accept a description of his symptoms from "the person who is most familiar" with the child, such as a parent or guardian. *See* 20 C.F.R. 416.928(a). But the ALJ may still accord greater weight to objective medical evidence than to the testimony of the parent. *See Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992). Indeed, based upon his evaluation of the entire case record, the ALJ "may find all, only some, or none of an individual's allegations to be credible." *See Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, S.S.R. 96-7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996).[23] Such credibility findings "are precisely the kinds of determinations that the ALJ is best positioned to make." *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). As such, they are "entitled to considerable judicial deference." *Haywood v. Sullivan*, 888 F.2d 1463, 1470 (5th Cir. 1989); *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986).

Yet, the "ALJ must make specific findings concerning the credibility of the parent's testimony." *Jefferson v. Barnhart*, 356 F. Supp. 2d 663, 679 (S.D. Tex. 2004) (quoting *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001)). It is not sufficient for the ALJ to

---

[23] Social Security Administration Rulings ("SSR") are not binding on the court, "but they may be consulted when the statute at issue provides little guidance." *Myers*, 238 F.3d at 620 (citing *B.B. ex rel. A.L.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir.1981). The Fifth Circuit has frequently relied upon the rulings in evaluating ALJs' decisions. *See Newton*, 209 F.3d at 456 (relying on SSR 96-2p); *Scott v. Shalala*, 30 F.3d 33, 34 (5th Cir.1994)(relying on SSR 83-12); *Spellman v. Shalala*, 1 F.3d 357, 362 (5th Cir.1993)(relying on SSR 83-20).

make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." *Id.* Instead, the "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* (citing SSR 96-7p).

In this instance, the ALJ found that "[t]he evidence of record supports some, but not all of the mother's testimony regarding the claimant's symptoms and functional limitations." (Tr. at 24). The ALJ stated that he "assign[ed] greater probative weight to the objective medical evidence in determining the claimant's functional limitations." (Tr. at 24). In his analysis of each domain, the ALJ addressed Thomas's relevant testimony, and compared her allegations to the objective evidence. With regard to C.T.'s ability to acquire and use information, the ALJ acknowledged that Thomas's testimony regarding her son's school performance was "consistent with the evidence of record." (Tr. at 24). He also noted that Thomas did "not allege any significant problems in the claimant's intelligence or cognitive abilities." (*Id.*). In his discussion of C.T.'s ability to attend and complete tasks, the ALJ found that "[d]espite [Thomas's] allegation of marked restrictions in his ability to attend and complete tasks, the evidence indicates that the claimant's functioning improves with medication." (*Id.*). He based this finding on "the evidence from both the claimant's medical sources and his school [which] indicate that his symptoms respond well to prescribed medication." (Tr. at 25). He noted further that "there are no indications that [C.T.] suffers from any adverse side effects from his medication." (*Id.*). The ALJ, in his determination of C.T.'s ability to interact and relate to others, acknowledged Thomas's claim that C.T. has "marked behavioral problems" because he "does not pay attention to her, argues with her, gets angry easily, and fights with other children." (*Id.*). The ALJ then remarked, however, that the objective evidence does not support C.T.'s limitations "to the extent alleged" by Thomas. (*Id.*). In support of his finding, the ALJ referred to

24

the reports from C.T.'s school teachers, which "indicate that he has some behavioral problems, but that he responds well to reprimands, guidance, and medication." (Tr. at 26). Finally, the ALJ found that Thomas's "contention that her son has medically determinable impairments that impose some limitations on his functioning" was credible. (Tr. at 27). However, from his evaluation of the record as a whole, the ALJ found that the evidence in the record "demonstrates that the claimant can perform personal and household chores, interact appropriately with his teachers and classmates, that his symptoms respond favorably to medication and treatment, and that he has no significant cognitive deficits." (*Id.*). On this record, the court finds that the ALJ provided sufficient rationale for those instances in which he decided to not give full weight to Thomas's allegations. *See Jefferson*, 356 F. Supp. 2d at 679; *Falco*, 27 F.3d at 164. Because the ALJ's credibility findings are linked to substantial evidence, the those findings need not be disturbed. *See Jefferson*, 356 F. Supp. 2d at 679. It is recommended that Defendant's motion for summary judgment on this issue be granted.

### *Ability to Attend and Complete Tasks*

Plaintiff next complains of the ALJ's failure to find that to C.T.'s impairments result in an extreme or marked limitation in his ability to attend to and complete tasks. (Plaintiff's Motion at 11). In determining a child's ability to attend to and complete tasks, the ALJ is to consider how well the child is able to focus and maintain his attention, and how well the child can begin, carry through, and finish his activities. 20 C.F.R. § 416.926a(h). The Regulations provide that a child of C.T.'s age:

> should be able to focus [his] attention in a variety of situations in order to follow directions, remember and organize [his] school materials, and complete classroom and homework assignments. [He] should be able to concentrate on details and not make careless mistakes in [his] work (beyond what would be expected in other children [his] age who do not have impairments). [He] should be able to change [his] activities or routines without distracting [themselves] or others, and stay on task and in place when appropriate. [He] should be able to sustain [his] attention well enough to participate in group sports, read by [himself], and complete family chores. [He] should also be able to complete a transition task (e.g., be ready for the school bus,

25

change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).  A "marked" limitation is one that is "more than moderate, but less than extreme," and may be present if the impairment interferes *seriously* with the plaintiff's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(ii)(2) (emphasis added).  In this case, the ALJ found that C.T. has "less than marked [l]imitations" in his ability to attend to and complete tasks.  (Tr. at 25).  He acknowledged the determination, by Patricia B. Nicol, M.D. ("Dr. Nicol"), the consulting doctor from Disability Determination Services, that C.T. had a "marked" limitation in this domain.  (*Id.*).  However, the ALJ also pointed to Dr. Nicol's note "that the claimant's hyperactivity deceased when he was on medication."  (*Id.*) (citing Tr. at 200).  He "conceded that [C.T.] has significant difficulties with hyperactivity when he is not taking his prescribed medication," but found that "the evidence from both the claimant's medical sources and his school indicate[s] that his symptoms respond well to prescribed medication."  (*Id.*).  In reaching this conclusion, the ALJ relied on two treatment records from Dr. Farag, from September 2003 and May 2005, in which she stated that C.T. had a "favorable response" to medication and treatment. (Tr. at 24 ) (citing Tr. at 244, 253).  He also found that C.T.'s school records show that he "functions well while on medication," because he is "a good student and is at least satisfactory in virtually all areas of behavior."  (Tr. at 24) (citing Tr. at 166).

In her motion, Plaintiff claims that the ALJ erred because he failed to "reconcile or explain his rejection of" Dr. Nicol's finding that C.T. "had a 'marked limitation' in the domain of attending and completing tasks."  (Plaintiff's Motion at 14; Plaintiff's Response at 2) (citing Tr. at 200).  She argues that the ALJ "must consider non-examining, reviewing State medical consultant opinions and, when the ALJ does not give controlling weight to a treating source as here, the ALJ must explain the weight given to the State medical consultant opinions."  (Plaintiff's Response at 2–3).  She claims that, because the ALJ "did not explain the weight he gave to the State medical consultant

opinion," he "ran afoul of 20 C.F.R. § 404.1527(f)(2)(i)–(ii)."[24]  (*Id.* at 3).  However, Plaintiff's

argument is based on an inaccurate interpretation of the Regulations.   Under 20 C.F.R. §

416.927(f)(2)(ii):

> When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician or psychologist, the administrative law judge will evaluate the findings using relevant factors in paragraphs (a) through (e) of this section . . . . *Unless the treating source's opinion is given controlling weight*, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

(*Id.*) (emphasis added).  From a careful reading of the Regulation, it is clear that it only requires the

ALJ to explain the "weight given to the opinions" of nonexamining sources when he does not give

the *treating source* "controlling weight."   Here, the ALJ afforded controlling weight to C.T.'s

treating physician, Dr. Farag.   Because he did so, the Regulations did not require him to provide any

explanation regarding his evaluation of Dr. Nicol's opinion.   *See* 20 C.F.R. § 416.927(f)(2)(ii).

More importantly, numerous school and medical records support the ALJ's conclusion that,

on medication, C.T. does not have a marked limitation in his ability to attend and complete tasks.

In determining whether a child is disabled, an ALJ considers the "effects of medication" on a

claimant's "symptoms, signs, laboratory findings, and functioning." 20 C.F.R. § 416.924a(b)(9)(I).

"A medical condition that can reasonably be remedied either by surgery, treatment, or medication

is not disabling."  *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) (citing 20 C.F.R. §§

404.1530(a), (b) and 416.930(a), (b) (1986)) (additional citations omitted).  A child must follow the

treatment if it can reduce his functional limitations "so that they are no longer marked and severe."

20 C.F.R. § 416.930(a).  Here, C.T.'s pre-kindergarten teacher, Ms. Monroig, remarked that he was

---

[24] Plaintiff's citation to 20 C.F.R. § 404.1527 is incorrect, because that section pertains to applications for Disability Insurance benefits.  Here, because Plaintiff applied for Supplemental Security Income, the appropriate section is 20 C.F.R. § 416.927.

able to function "O.K." with medication.[25]   (Tr. at 132).  In a "School Activity Report," dated October 20, 2003, Ms. Butler, C.T.'s assistant principal, stated that "[C.T.] behaves like a normal 4 year [old] when he is on his prescribed medication."  (Tr. at 128).   She rated C.T.'s ability to complete tasks on time, to retain instructions from week to week, and to initiate activities independently as "above average" when "compared with unimpaired students [C.T.'s] age."  (Tr. at 129).  Ms. Butler noted that C.T.'s ability to "exhibit[] organization in accomplishing tasks" and to "follow[] oral instructions" was "average."   (*Id.*).   One year later, Ms. Johnson, C.T.'s kindergarten teacher, found that he satisfactorily completed tasks and used time and materials effectively.  (Tr. at 166).  Finally, Ms. Cole, C.T.'s post-kindergarten summer school teacher, stated that, although he "need[ed] to work on . . . listening [and] following directions," he "stays on task and completes assignments."  (Tr. at 176).  Dr. Louis, from the Primary Medicine Center, reported that C.T.'s "medications work well during the day - [a]t school," but that he remained "somewhat hyperactive in [the] afternoon."  (Tr. at 331).  Dr. Farag observed that C.T. was "doing well" on his medications on several different occasions.  (Tr. at 321, 327–29).  It is easy to see, from this record as a whole, that substantial evidence supports the ALJ's conclusion that C.T.'s impairments do not result in a "marked" limitation in his ability to attend and complete tasks.

*Ability to Interact and Relate with Others*

Plaintiff argues, next, that the ALJ erred in finding that C.T.'s impairments do not result in an extreme or marked limitation in his ability to interact with and relate to others.  (Plaintiff's Motion at 14).  To determine whether a child has a marked limitation in his ability to interact and relate with others, the ALJ must consider how well the child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others,

---

[25] Plaintiff alleges that Ms. Monroig's report "indicates that, even with medication, [C.T.] has a hard time following directions, and he continues to be off task and disruptive."  (Plaintiff's Motion at 12) (citing Tr. at 132). However, Ms. Monroig's only comment regarding C.T.'s behavior was that he "function[s] O.K. with medications." (Tr. at 132).

complies with rules, responds to criticism, and respects and takes care of the possessions of others.

20 C.F.R. § 416.926a(i).  The Regulations state that a child of C.T.'s age:

> should be able to develop more lasting friendships with children who are [his] age.
> [He] should begin to understand how to work in groups to create projects and solve
> problems.  [He] should have an increasing ability to understand another's point of
> view and to tolerate differences.  [He] should be well able to talk to people of all
> ages, to share ideas, tell stories, and to speak in a manner that both familiar and
> unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv).  Here, the ALJ found that C.T. had "less than marked limitations" in his ability to interact and relate with others.  (Tr. at 26).  The ALJ conceded that C.T. has "some limitations in interacting with others," but found that those limitations were "not to the extent alleged" by Thomas.  (Tr. at 25).  In support of his decision, the ALJ pointed to statements from C.T.'s teachers "that he misbehaves sometimes, but that he normally corrects his behavior when reprimanded."  (Tr. at 25) (citing Tr. at 151).  The ALJ noted, in particular, Ms. Butler's observation that C.T. "behaved like a normal four-year-old on medication."  (Tr. at 25) (citing Tr. at 129).  The ALJ also found that, "[d]espite the mother's allegations of marked behavioral problems, [C.T.] stated he plays games, such as basketball, with other children in school and in the neighborhood."  (*Id.*).  "Such activity," he held, "shows that the claimant can interact with others when properly motivated."  (*Id.*).  The ALJ gave "little weight to the statements of the mother's friends and neighbors regarding the severity of [C.T.'s] behavioral problems."  (*Id.*).  He explained that "[b]y her own admission,  [Thomas] is usually unsuccessful in getting [C.T.] to take his medication."  (*Id.*).  For that reason, he stated, C.T. "may not be benefitting from the positive affects of his prescribed medication" when he is "observed by the friends and neighbors."  (*Id.*).

In support of her argument that C.T. has "an extreme or at least a marked limitation" in his ability to interact and relate with others, Plaintiff fails to cite any objective evidence in the record.  (*See* Plaintiff's Motion at 15).  Instead, she points only to her testimony that C.T. "acts disrespectfully and violently with others."  (*Id.*).  Although she claims that C.T.'s "aggressive

behavior is also indicated by the medical records," those are all instances which Thomas reported to the doctor. (*Id.*) (citing Tr. at 331, 326). The ALJ acknowledged her subjective complaints, but decided to give "greater probative weight . . . to the observations of the claimant's school teachers." (Tr. at 25–26). The ALJ explained that those school records indicate that C.T. "misbehaves sometimes," but they also show that he "corrects his behavior when reprimanded." (Tr. at 25). As noted, it is within the discretion of the ALJ to weigh the evidence, and he is free to assign more weight to the school records than to Thomas's subjective complaints. *See Jefferson*, 356 F. Supp.2d at 679; *Falco*, 27 F.3d at 164. Moreover, there is ample evidence in the record to support the ALJ's determination that C.T.'s impairments do not result in a marked limitation in his ability to interact and relate with others. For example, in C.T.'s "School Activity Report" from October 20, 2003, Ms. Butler found that he had an "average" ability to make and keep friends. (Tr. at 129). On November 11, 2003, Ms. Monroig, in C.T.'s "Prekindergarten Report Card," stated that he "consistently" shared, worked, and cooperated with others. (Tr. at 173). She also mentioned that C.T. was "a very good helper and worker." (*Id.*). In C.T.'s "Kindergarten Progress Report," dated September 17, 2004, Ms. Johnson reported that his ability to "share[] classroom materials" was "[e]xceptional." (Tr. at 168). In a later "Kindergarten Progress Report," dated November 30, 2004, Ms. Johnson stated that C.T. satisfactorily "work[ed] and play[ed] well alone and with others." (Tr. at 169). In her final assessment of C.T. for the 2004-2005 school year, Ms. Johnson concluded that he was "satisfactory" in almost all behavioral categories. (Tr. at 166–67). According to Ms. Johnson, C.T.'s performance was satisfactory, or better, in all categories for the final quarter of that school year. (*Id.*). On this record, it is clear that substantial evidence supports the ALJ's finding in this domain.

*Ability to Care for Oneself*

Plaintiff also challenges the ALJ's determination that C.T.'s impairments result in a less than marked limitation in his ability to care for himself. (Plaintiff's Motion at 15). For this domain, the

ALJ is to consider how well the child maintains a healthy emotional and physical state, including whether his physical and emotional wants and needs are met in appropriate ways; how the child copes with stress and changes in his environment; and whether the child takes care of his own health, possessions, and living area. 20 C.F.R. § 416.296a(k). According to the Regulations, a child of C.T.'s age:

> should be independent in most day-to-day activities (e.g., dressing [himself], bathing [himself]), although [he] may still need to be reminded sometimes to do these routinely. [He] should begin to recognize that you are competent in doing some activities and that you have difficulty with others. [He] should be able to identify those circumstances when you feel good about yourself and when you feel bad. [He] should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. [He] should begin to demonstrate consistent control over [his] behavior, and [he] should be able to avoid behaviors that are unsafe or otherwise not good for [him]. [He] should begin to imitate more of the behavior of adults [he] know[s].

20 C.F.R. § 416.296a(k)(2)(iv). Here, in finding that C.T. was able to care for himself, the ALJ stated that Thomas "did not allege any specific limitations in the claimant's ability to perform personal or household chores in an age appropriate manner," except for her son's distaste for taking "care of his room." (Tr. at 26). The ALJ noted that neither C.T.'s medical records nor his school records suggest that he "cannot care for himself in an age appropriate manner, or that he cannot properly cope with changes in his environment." (*Id.*).

Yet again, Plaintiff points only to her testimony in support of her claim that C.T. has a "marked" limitation in this domain. (*See* Plaintiff's Motion at 16). In particular, she relies on her testimony regarding C.T.'s "self-injurious behaviors." (*Id.*). However, she also testified that C.T. "understand[s] that he can hurt himself or [that] he can hurt other people." (Tr. at 363). She also testified that C.T. can bathe himself. (Tr. at 362). That testimony, along with C.T.'s school and medical records, and the record as a whole supports the ALJ's finding in this domain. For example, Ms. Johnson stated, in November 2005, that C.T. satisfactorily "[f]ollows school and classroom rules," and "expresses feelings in acceptable ways." (Tr. at 169). In C.T.'s final "Prekindergarten

Report" for the 2004-2005 school year, Ms. Johnson stated that, when she reprimanded C.T. for misbehaving, he corrected the behavior "IMMEDIATELY!"  (Tr. at 151).  Dr. Farag, in a "Mental Status Examination Report," dated January 21, 2004, stated that C.T. has "normal" "mood and affect" and that he had "good" "[g]eneral appearance, grooming, [and] motor behavior."  (Tr. at 202–03).  On this record, there is much "more than a scintilla" of objective evidence to support the ALJ's finding that C.T.'s impairments do not result in a marked limitation in his ability to care for himself.  See *Ripley*, 67 F.3d at 555.

*Health and Physical Well-Being*

Finally, Plaintiff contends that the ALJ erred because he failed to find that C.T.'s impairments result in at least a marked limitation in the domain of health and physical well-being. (Plaintiff's Motion at 17).  For this domain, the ALJ must consider the cumulative effects of any physical or mental impairments, and their associated treatments or therapies, that were not considered in the domain of moving about and manipulating objects.[26]  20 C.F.R. § 416.926a(*l*).  The Regulations also require the ALJ to consider the extent to which medications taken for mental impairments may have physical effects on the child-claimant.  20 C.F.R. § 416.926a(*l*)(2).  Here, with regard to C.T.'s ADHD, the ALJ found that neither the medical evidence nor the school record shows that he manifested signs of "marked inattention," "marked impulsiveness," or "marked hyperactivity."  (Tr. at 23).  In support of his finding that C.T.'s hyperactivity "improves with medication," he pointed to treatment records from May 2005, which show that the child was "doing well on his medication." (Tr. at 24).  The ALJ also found that C.T.'s Tourette's syndrome "does not appear to impose any marked limitations on [his] functioning."  (Tr. at 26).  As noted by the ALJ, Dr. Facchini diagnosed C.T. with Tourette's syndrome, but determined the extent of the illness was

---

[26] In the domain of moving about and manipulating objects, the ALJ found that C.T. "does not have any limitations."  (Tr. at 26).  In support of his finding, he stated that Thomas "did not allege any difficulties in [C.T.'s] ability to move about, nor does the evidence of record document the presence of a medically determinable physical impairment."  (*Id.*).

"mild." (Tr. at 26, 297).   None of C.T.'s other physicians addressed his Tourette's syndrome or prescribed any treatment for it.  Based on this record, the ALJ did not err in determining that C.T.'s "Tourette's syndrome[,] in addition to [his] ADHD, does "not appear to impose any marked limitations on the claimant's functioning." (Tr. at 26).

In her motion, Plaintiff alleges that, "in evaluating [C.T.'s] limitations in this domain, and throughout his entire decision, the ALJ fails to recognize [C.T.'s] long history of asthma." (Plaintiff's Motion at 17).  Because of this omission, Plaintiff argues, the "case must be remanded to allow the ALJ to evaluate the combined effects of [C.T.'s] chronic, moderate asthma, with history of repeated cases of pneumonia, his ADHD and his Tourette's Syndrome, in combination . . . ." (*Id.*).  In response, Defendant argues that "Plaintiff has failed to show any prejudice because she cannot show that, even if the ALJ had evaluated asthma along with his evaluation of C.T.'s ADHD and Tourette's syndrome, the ALJ would have reached a different result in this domain." (Defendant's Motion at 9).

It is well settled that, under the Social Security Act, and its implementing regulations, an ALJ is required to develop the facts related to a claim of disability "fully and fairly."  *Brock v. Chater*, 84 F.3d 726 (5th Cir.1996); *Kane v. Heckler*, 731 F.2d 1216, 1219–20 (5th Cir. 1984); 42 U.S.C. 405(g); 20 C.F.R. § 410.640.  When a claimant has multiple impairments, the Act requires the Commissioner "to consider the combined effects of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523).  Further, there is no dispute that, in considering whether a claimant's impairments meet or equal the requirements of a specific Listing, the ALJ must consider the combined effect of all of them.  *See* 20 C.F.R. §§ 416.906, 416.911; *Myers*, 238 F.3d at 619; *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985).  Here, it is true that C.T.'s medical records suggest that his asthma is well controlled by medication.  (*See* Tr. at 181, 189, 201).  Unfortunately, however, the ALJ failed

to even mention C.T.'s asthma anywhere in his decision.  This is particularly troubling because asthma is one of the disabilities alleged in Thomas's application for benefits.  More importantly, the ALJ failed to evaluate the effects of C.T.'s asthma in combination with his ADHD and Tourette's syndrome.  The law is clear that "to develop the facts related to a claim of disability 'fully and fairly'" for a claimant with multiple impairments, the ALJ must consider the combined effect of *all* of the alleged impairments.  *See Loza*, 219 F.3d at 393; *see also* 20 C.F.R. §§ 416.906, 416.911.  On this record, Defendant has not shown that the ALJ satisfied his duty to evaluate the evidence fully.  *See James v. Bowen*, 793 F.2d 702, 705 (5th Cir. 1986).  Because the court "may not reweigh the evidence or substitute its judgment" for that of the ALJ, it must reluctantly conclude that Thomas is entitled to a remand so that the ALJ may properly develop the administrative record on C.T.'s asthma.  *See Fraga*, 810 F.2d at 1302.  Further, the court finds that C.T.'s rights were affected because the ALJ abrogated his duty to consider all of the evidence and to adequately develop the record.  *See* 20 C.F.R. § 410.640.  For these reasons, this matter is remanded, under sentence four of 42 U.S.C. 405(g), so that the record can be developed fully, which will allow the ALJ to render a decision that is supported by substantial evidence.

**CONCLUSION**

In sum, the ALJ's decision to deny disability benefits to Thomas was not supported by substantial evidence, and was therefore not rendered in accordance with the law governing her claim.  Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that Defendant's Motion for Summary Judgment be **DENIED**.  It is further **RECOMMENDED** that Plaintiff's claim for Supplemental Security Income benefits is **REMANDED**, so that the record can be further developed on the severity of C.T.'s asthma, consistent with this opinion.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have ten (10) days from the receipt of it to file written objections

thereto, pursuant to 28 U.S.C. § 636(b)(1)(c)), General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, **and** to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 20th day of August, 2008.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**